**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**FILED**
**March 31, 2023**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**Administrator Larry Crawford, individually and in his**
**official capacity, Captain Carl Aldridge, individually and in his**
**official capacity, C.O. Paul Diamond, individually and in his**
**official capacity, C.O. Don Vance, individually and in his**
**official capacity, C.O. David Rodes, individually and in his**
**official capacity, C.O. Joshua Scarberry, individually and in his**
**official capacity, and The West Virginia Regional Jail and**
**Correctional Facility Authority,**
**Defendants Below, Petitioners,**

**vs)  No. 21-0732** (Cabell County 18-C-240)

**Michael A. McDonald,**
**Plaintiff Below, Respondent**

**MEMORANDUM DECISION**

Michael A. McDonald claims that correctional officers used excessive force against him during his pre-trial detention at the Western Regional Jail in Barboursville in June 2016.  Mr. McDonald states that he was sprayed in the face with Oleorespin Capsicum foam without provocation and strapped to a restraint chair where he remained for twenty-eight hours.  In May 2018, Mr. McDonald brought a claim under 42 U.S.C. § 1983 for excessive force and deliberate indifference as well as negligence and other common law tort claims against Petitioners[1] —the West Virginia Regional Jail and Correctional Facility Authority; supervisory employees Administrator Larry Crawford and Captain Carl Adridge; and Correctional Officers Paul Diamond, Don Vance, David Rodes, and Joshua Scarberry.  Following discovery, Petitioners collectively moved for summary judgment on qualified immunity grounds.  The circuit court denied their motion on September 2, 2021, and Petitioners now appeal.

Viewing all facts in favor of Mr. McDonald, we agree that there are disputed issues of material fact regarding whether the correctional officers violated his clearly established rights under the Fourteenth Amendment to the United States Constitution.  A jury could also find that the conduct in question was within the correctional officers' scope of

---

[1] Petitioners are represented by counsel Dwayne E. Cyrus and Kimberly M. Bandy. Mr. McDonald is represented by counsel Kerry A. Nessel.

employment creating vicarious liability for their employer, the WVRJCFA. So, the correctional officers and the WVRJCFA are not entitled to qualified immunity. But because the claims against Administrator Crawford and Captain Aldridge lack legal and factual support, they are entitled to qualified immunity. For these reasons, the order of the circuit court is affirmed, in part, and reversed, in part, and this case is remanded for further proceedings consistent with this memorandum decision.[2]

## I. Factual and Procedural History

Just after midnight on June 27, 2016, officers with the Putnam County Sheriff's Department arrested Mr. McDonald on an outstanding capias warrant and transported him to the Western Regional Jail in Barboursville. Upon his arrival, officers escorted Mr. McDonald to the booking area where he was processed. Mr. McDonald was a heavy user of methamphetamines at the time and admitted to being emotionally unstable.

Night Shift Supervisor Corporal Paul Diamond suspected that Mr. McDonald was high on drugs because "[h]e was kind of fidgety which made him a little bit unpredictable." Cpl. Diamond directed Correctional Officer David Rodes to place Mr. McDonald into a holding cell a few feet away from the booking area, as there were multiple new arrestees on the benches awaiting to be processed. Mr. McDonald, who was familiar with the booking area of the jail, refused to go into the holding cell because he claims it was crowded with inmates yelling that they had been placed there for days without being allowed to take a shower or make a phone call. Mr. McDonald allegedly said, "I ain't going in there, Diamond. Look at all those people in there man. . . . you guys shouldn't be treating people this way." Mr. McDonald claims he told the officers, "You guys should be getting people back to population where they belong."

Cpl. Diamond and other correctional officers continued to instruct Mr. McDonald to enter the holding cell. Mr. McDonald refused their commands and dropped a foam mattress that he was carrying. Cpl. Diamond held a can of OC foam up to Mr. McDonald's face and told Mr. McDonald that he was going to spray him if he did not comply. Mr. McDonald still refused, and Cpl. Diamond deployed a half-second burst of OC foam to Mr. McDonald's face. Mr. McDonald dropped to the ground and Cpl. Diamond and Correctional Officers Rodes and Joshua Scarberry placed him in restraints. A video recording, lasting approximately two hours, captures the time Mr. McDonald entered booking to the time Cpl. Diamond sprayed him with OC foam. This video is part of the record.

---

[2] This case meets the "limited circumstances" requirement of Rule 21(d) of the West Virginia Rules of Appellate Procedure and is appropriate for a memorandum decision.

While Cpl. Diamond viewed Mr. McDonald's refusal to comply with his direction as a possible threat to officer safety, he conceded that the officers could have placed their hands on Mr. McDonald and escorted him into the holding cell as an alternative to spraying his face with OC foam. Cpl. Diamond testified that he and the other officers were performing duties within the scope of their employment when they used force against Mr. McDonald.

After Mr. McDonald was placed in restraints, several correctional officers escorted him to the shower area and washed his face with cool water to remove the OC foam. After a nurse checked Mr. McDonald, he was escorted to an outside recreation yard to decontaminate with fresh air.

Mr. McDonald behaved erratically while in the recreation yard. He explained that some of the OC foam had not completely washed off, that it ran down his body onto his genital area causing extreme burning pain, and he felt like he was "on fire." Mr. McDonald, who was still handcuffed behind his back, contends that he tried to air out his genitals to relieve the burning pain, and his pants and underwear fell to his ankles. According to Cpl. Diamond, Mr. McDonald exposed his genitals, made lewd hand gestures, and fondled his rectal area with his hands. Mr. McDonald banged his head on the door to the recreation yard repeatedly to get the attention of the correctional officers.

Cpl. Diamond decided to place Mr. McDonald in a restraint chair; he claimed he reached this decision to prevent Mr. McDonald from harming himself. Mr. McDonald was initially placed in the restraint chair at 1:55 a.m. on June 27 by Cpl. Diamond and Officer Rodes. Officer Don Vance used a handheld video camera to document Mr. McDonald's placement in the restraint chair and transport to an interview room, but WVRJCFA did not produce this video during discovery. Throughout his time in the restraint chair, a watch log of Mr. McDonald's behavior and activities indicates that corrections staff regularly monitored Mr. McDonald.[3] He remained in the restraint chair for several shifts—nearly twenty-eight hours.

Mr. McDonald admits that when in the restraint chair, he was disruptive at times and felt like he was fighting off evil spirits because of methamphetamine. The watch log corroborates Mr. McDonald's account and reveals that, at times, he yelled and sang. But other watch log accounts indicated Mr. McDonald was sleeping, calm, relaxed, and talking. The watch log indicates that corrections staff freed Mr. McDonald's legs and arms at times so he could stretch and that they provided him with food, water, and bathroom breaks. But some of the notations made in the watch log provide little insight into Mr. McDonald's behavior to explain corrections staff's extended use of the restraint chair. Several notations

---

[3] In addition to the jail's watch log, records from Prime Care Medical, the healthcare provider at the jail, indicate that healthcare professionals checked on Mr. McDonald more than thirty times while he was in the restraint chair.

document Mr. McDonald as being "in chair" or "talking & breathing." Mr. McDonald's deposition testimony contradicts some of the entries in the watch log. For instance, Mr. McDonald claims that he never refused a food tray even though the watch log says so. He states that the correctional officers teased him with food trays and sat there "laughing at me." Mr. McDonald denies that he "threatened to kill officer" even though that entry exists in the watch log. Mr. McDonald also claims that he had to beg for bathroom breaks and that they were never offered to him.

Hours before he was released from the restraint chair, correctional staff documented Mr. McDonald as being "calm, sitting relaxed in chair." The watch log indicates that Cpl. Diamond finally removed Mr. McDonald from the restraint chair at 5:15 a.m. on June 28. Cpl. Diamond testified that he could not recall an inmate being in the restraint chair for anywhere near that length of time. In fact, he could not recall an inmate being in the restraint chair for more than ten hours.

At the time of these events, Larry Crawford was the Administrator at the Western Regional Jail, and Carl Aldridge was its Chief Correctional Officer. There is no evidence that Administrator Crawford was present during the events in question or that he played any role in these events. Likewise, Captain Aldridge was not on duty on the night in question. Correctional Officers Vance, Rodes, and Scarberry were present during portions of the above events.

In May 2018, Mr. McDonald filed this civil action alleging violation of his constitutional rights as well as a variety of common law torts against Petitioners. In his amended complaint, Mr. McDonald asserts a 42 U.S.C. § 1983 claim for excessive force and deliberate indifference to his safety against the individual defendants, and a variety of intentional torts and various claims of negligence against the individual defendants and the WVRJCA. In particular, Mr. McDonald alleges that the supervisory defendants and the WVRJCA were negligent in their training and supervision of the correctional officers.[4] In the amended complaint's final count, Mr. McDonald also asserts a claim for "Respondent [sic] Superior, Law of Agency."

After discovery concluded, Petitioners filed a motion for summary judgment asserting qualified immunity. They stated that the evidence did not support a claim for excessive force and that Mr. McDonald failed to produce any evidence to prove his allegations that his constitutional rights were violated or that the defendants acted in a

---

[4] During the pendency of the case, Mr. McDonald voluntarily dismissed his claim against the WVRJCFA for negligent hiring and retention. And although not expressly dismissed, Mr. McDonald submitted no evidence or argument in the pleadings below in support of his claim of a civil conspiracy involving the alleged cover-up of excessive force against jail inmates.

fraudulent, malicious, or otherwise oppressive manner. Petitioners claimed that the use of force was reasonable considering Mr. McDonald's behavior and that the WVRJCFA, and supervisors Crawford and Aldridge cannot be held vicariously liable under these facts.

In response, Mr. McDonald stated that the video evidence clearly showed that there were other options available besides spraying OC foam directly into his eyes. He stated that the video shows a docile inmate who had his hands down to his side when sprayed, and that the officers could have simply placed their hands on his wrists and escorted him into the holding cell. Mr. McDonald claimed that the most egregious acts of cruel and unusual punishment concern the extended use of the restraint chair. Mr. McDonald submitted a document that he claims is a printout from the chair's manufacturer's website, which states "Detainees should not be left in the SureGuard Safety Restraint Chair for more than two hours. The SureGuard Safety Restraint Chair should **never** be used as a means of punishment."[5] Mr. McDonald also noted that a watch log entry states that "all interactions with sprayed inmate was [sic] recorded" but this video evidence was not supplied during the discovery phase. Mr. McDonald claimed that he was the victim of excessive force at the hands of the individual defendants and that the WVRJCFA should not be afforded qualified immunity because the acts and omissions of its employees were fraudulent, malicious, and oppressive.

In an order dated September 2, 2021, the circuit court refused to afford Petitioners qualified immunity and denied their motion for summary judgment. It determined that there were numerous disputes about the material facts underlying the immunity determination that should be resolved by a jury.

## II. Standard of Review

We are asked to determine whether the circuit court erred in denying summary judgment to Petitioners based on their assertion of qualified immunity. "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law."[6] While the denial of summary judgment is generally not subject to appellate review, we have carved out an exception, holding that "[a] circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine."[7] And "[t]his

---

[5] (Emphasis in original). Mr. McDonald did not present testimony providing any context for how this document is to be interpreted or how it applies.

[6] Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Fed. Ins. Co. of N.Y.*, 148 W. Va. 160, 133 S.E.2d 770 (1963).

[7] Syl. Pt. 2, *Robinson v. Pack*, 223 W. Va. 828, 679 S.E.2d 660 (2009).

Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court."[8] In conducting our de novo review, we "must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion."[9] The parties' arguments will be considered against this plenary standard.

### III. Analysis

Petitioners argue that they are entitled to qualified immunity as a matter of law on all claims because Mr. McDonald has "alleged nothing more than a violation of abstract rights." Factually, they contend that Cpl. Diamond's actions of spraying Mr. McDonald with OC foam and the use of the restraint chair was reasonable considering the circumstances and do not constitute excessive use of force. Petitioners criticize the circuit court's order for discussing them collectively without providing an analysis of the conduct that would support a claim against them individually.[10] Mr. McDonald disagrees that Petitioners are entitled to qualified immunity. He contends that triable issues of fact remain for a jury to decide, including whether the supervisory officers and/or the WVRJCA were directly and/or vicariously liable for the incidents of excessive force and deliberate indifference.

To determine whether the State, its agencies, officials, and employees are entitled to qualified immunity for discretionary functions, this Court has held:

> To the extent that governmental acts or omissions which give rise to a cause of action fall within the category of discretionary functions, a reviewing court must determine whether the plaintiff has demonstrated that such acts or omissions are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known

---

[8] Syl. Pt. 1, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W. Va. 80, 576 S.E.2d 807 (2002).

[9] *Painter v. Peavy*, 192 W. Va. 189, 192, 451 S.E.2d 755, 758 (1994) (citations omitted).

[10] Petitioners also contend that the circuit court's order contains several inaccurate statements that are either contrary to or not factually supported by the record. For instance, the order states that Mr. McDonald urinated and regurgitated on himself while in the restraint chair but there is no evidence in the record to support that claim. While we agree that the order contains certain unsupported factual statements and/or inaccuracies, it contains sufficient detail to permit meaningful appellate review.

6

or are otherwise fraudulent, malicious, or oppressive in accordance with *State v. Chase Securities, Inc.*, 188 W.Va. 356, 424 S.E.2d 591 (1992). In absence of such a showing, both the State and its officials or employees charged with such acts or omissions are immune from liability.[11]

But when the plaintiff identifies a clearly established right which has been violated by the acts or omissions of the State, its agencies, or its officials or employees, or fraudulent, malicious, or oppressive acts committed by such officials or employees, then the court must determine whether such acts or omissions were within the scope of the public official or employee's employment.

> If the plaintiff identifies a clearly established right or law which has been violated by the acts or omissions of the State, its agencies, officials, or employees, or can otherwise identify fraudulent, malicious, or oppressive acts committed by such official or employee, the court must determine whether such acts or omissions were within the scope of the public official or employee's duties, authority, and/or employment. To the extent that such official or employee is determined to have been acting outside of the scope of his duties, authority, and/or employment, the State and/or its agencies are immune from vicarious liability, but the public employee or official is not entitled to immunity in accordance with *State v. Chase Securities, Inc.*, 188 W. Va. 356, 424 S.E.2d 591 (1992) and its progeny. If the public official or employee was acting within the scope of his duties, authority, and/or employment, the State and/or its agencies may be held liable for such acts or omissions under the doctrine of *respondeat superior* along with the public official or employee.[12]

So, if the correctional officers were acting within the scope of their employment or duties, then the WVRJCFA may be held vicariously liable for those acts or omissions.

### A. Correctional Officers

Petitioners argue that Cpl. Diamond and the other correctional officers are entitled to qualified immunity in connection with Mr. McDonald's claims of violation of his constitutional rights as well as his tort claims because there is insufficient evidence that

---

[11] Syl. Pt. 11, *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014).

[12] *Id*. at Syl. Pt. 12.

they violated any clearly established right. Although Petitioners frame their argument in terms of whether Mr. McDonald has identified a clearly established right which they violated, the thrust of their argument is that their actions were objectively reasonable under these facts. They claim that Mr. McDonald was sprayed with OC foam for refusing to enter the holding cell and placed in the restraint chair because he was behaving erratically. Petitioners claim this use of force was objectively reasonable considering the circumstances, and the continued use of the restraint chair for approximately twenty-eight hours was reasonable in order to maintain order and control. Conversely, Mr. McDonald maintains that the use of force was clearly excessive and in violation of his constitutional rights.

Our case law makes clear this Court's "approach to matters concerning immunity historically has followed federal law due in large part to the need for a uniform standard when, as in the case before us, public officers are sued in state court for violations of federal civil rights pursuant to 42 U.S.C. § 1983."[13] In *Kingsley v. Hendrickson*,[14] the United States Supreme Court held that "a pretrial detainee must show only that the force . . . used against him was objectively unreasonable."[15] So, we proceed with the Fourteenth Amendment violation inquiry of the qualified immunity analysis under *Kingsley*'s objective unreasonableness standard.

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.[16]

"In the context of excessive force cases, the constitutional standard— reasonableness—is always an exceptionally fact-specific inquiry. Hence, there are two

---

[13] *City of Saint Albans v. Botkins*, 228 W.Va. 393, 398, 719 S.E.2d 863, 868 (2011); *see also Robinson*, 223 W.Va. at 834, 679 S.E.2d at 666 (citation omitted) ("federal law is controlling when public officials are sued in state court for violations of federal rights under 42 U.S.C. § 1983").

[14] 576 U.S. 389 (2015).

[15] *Id*. at 396-97.

[16] *Id*. at 397 (citation omitted).

8

ways to show a government official's actions are unreasonable."[17]  First, a violation of a constitutional right may be clearly established if the violation is so obvious that a reasonable state actor would know that what he is doing violates the Constitution; and second, if a closely analogous case establishes that the conduct is unconstitutional.[18]

Mr. McDonald first contends that excessive force was used against him when he was sprayed in the face with OC foam even though he was not acting aggressively.  Pretrial detainees are entitled to at least as much protection under the Fourteenth Amendment as convicted prisoners receive under the Eighth Amendment.[19]  And in *Ballard v. Delgado*,[20] this Court recognized that the malicious use of OC foam spray against an inmate is a violation of clearly established rights under the Eighth Amendment.[21]  The more serious allegation of excessive force in this case is Mr. McDonald's claim that he was left in the restraint chair for hours after he posed no apparent risk.  It is clearly established that continuing to hold an inmate in a restraint chair unnecessarily for an extended period of time following an incident can give rise to a genuine issue of fact as to whether a constitutional violation occurred.[22]

Viewing the facts in the light most favorable to Mr. McDonald, as we must at the summary judgment stage, there are genuine issues of material fact regarding his claim of excessive force.[23]  The same can be said about Mr. McDonald's claim for deliberate

---

[17] *Maston v. Wagner*, 236 W. Va. 488, 506, 781 S.E.2d 936, 954 (2015).

[18] *Id*. (citing *Siebert v. Severino*, 256 F.3d 648, 654-55 (7th Cir.2001)).

[19] *Riggins v. Nevada*, 504 U.S. 127, 135 (1992); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

[20] 241 W. Va. 495, 826 S.E.2d 620 (2019).

[21] *Id*. at 505, 826 S.E.2d at 630 (citing *Iko v. Shreve*, 535 F.3d 225, 235 (4th Cir. 2008) ("It is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain."); *Greene v. Feaster*, 733 F.App'x 80, 82 (4th Cir. 2018) ("It has long been established that prison officials violate the Eighth Amendment by using 'mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain.'")).

[22] *See Williams v. Benjamin*, 77 F.3d 756, 764 (4th Cir. 1996).

[23] While Petitioners cite cases sanctioning the use of OC foam spray and restraint chairs, these excessive force determinations are highly fact specific; sometimes the determinative facts are so disputed that summary judgment is inappropriate.  *See, e.g.,*

indifference to his medical needs. An inmate can bring suit under § 1983 for an Eighth Amendment violation "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."[24] Deliberate indifference requires a showing that the inmate had a sufficiently serious medical need and that the defendant knew of and disregarded an excessive risk to the inmate's health or safety.[25] We express no view on the merits of this claim, or any other claim that can proceed, but in drawing "any permissible inference from the underlying facts in the light most favorable to the party opposing the motion[,]"[26] there are genuine issues of material fact regarding the extent of Mr. McDonald's injuries, as well as the officers' actions and inactions toward him following the deployment of the OC spray, efforts at decontamination, and confinement in the restraint chair for an extended length of time.

Petitioners also maintain that the circuit court should have assessed the correctional officers' actions individually. We disagree. An individualized analysis is not always necessary at the summary judgment stage.[27] Because even if a single correctional officer's use of force was not excessive, "a law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983."[28] So, even if the other correctional officers did not use excessive force, a reasonable jury could nonetheless find on this record that they violated Mr. McDonald's clearly established

---

*Jacoby v. Mack*, 755 F. App'x 888, 897 (11th Cir. 2018) ("Viewing these facts in the light most favorable to Mr. Jacoby and drawing all reasonable inferences in his favor, we conclude that [correctional officers'] actions surrounding his pepper spraying— specifically his inadequate decontamination and subsequent restraint while he was neither combative nor disobeying orders—were objectively unreasonable and in violation of Jacoby's Fourteenth Amendment right to be free from excessive force.") (footnote omitted).

[24] *Estelle v. Gamble*, 429 U.S. 97, 104-05, (1976) (footnotes omitted).

[25] *See Winkler v. Madison Cnty.*, 893 F.3d 877, 890-91 (6th Cir. 2018).

[26] *Painter*, 192 W. Va. at 192, 451 S.E.2d at 758 (citations omitted).

[27] *See Est. of Booker v. Gomez*, 745 F.3d 405, 422 (10th Cir. 2014) (stating separate qualified immunity analyses for different defendants is not always necessary at the summary judgment stage of excessive force cases).

[28] *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996) (citations omitted).

rights by not taking steps to prevent Cpl. Diamond's alleged excessive force.[29]  For instance, in *Fogarty v. Gallegos*,[30] the court affirmed the district court's denial of qualified immunity on a failure to intervene claim because the defendant was present during the allegedly unconstitutional arrest, which lasted "between three and five minutes."[31]

## B. The WVRJCFA

We now turn to whether Mr. McDonald has presented sufficient evidence to establish a claim of negligence against the WVRJCFA directly, or for a jury to find that the correctional officers were acting within the scope of their duties, authority, and employment, such that the WVRJCFA may be held vicariously liable. Whether an act falls within the scope of employment generally presents a question of fact.[32]  But whether an act falls within the scope of employment may become a question of law where "the facts are undisputed and no conflicting inferences are possible."[33]  This Court has outlined several factors to consider for purpose of determining whether an act is within the scope of employment including, whether "the conduct 1) is of the kind [the employee] is employed to perform; 2) occurs within the authorized time and space limits; 3) it is actuated, at least in part, by a purpose to serve the master, and 4) if force is used, the use of force is not unexpectable by the master."[34]  "Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master."[35]

---

[29] *See Mascorro v. Billings*, 656 F.3d 1198, 1204 n.5 (10th Cir. 2011) ("It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section 1983.  Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.") (citations omitted).

[30] 523 F.3d 1147 (10th Cir. 2008).

[31] *Id.* at 1164.

[32] *W.Va. Reg'l Jail v. A.B.*, 234 W. Va. at 509, 766 S.E.2d at 768.

[33] *Id.* at 509, 766 S.E.2d at 768 (quoting *Mary M. v. City of Los Angeles*, 814 P.2d 1341, 1347 (Cal. 1991) (quotation omitted)).

[34] *Id.* at 510, 766 S.E.2d at 769 (quoting Restatement (Second) of Agency § 228 (1958)) (italics omitted).

[35] *Id.* (italics omitted).

Viewing all facts in favor of Mr. McDonald, a jury could reasonably find that the correctional officers' conduct in question was within the scope of their employment. Their acts occurred while they were working for the WVRJCFA and trying to secure Mr. McDonald. And Cpl. Diamond stated that he was acting in the scope of his employment during the events in question. "[A]n employer may be liable for the conduct of an employee, even if the specific conduct is unauthorized or contrary to express orders, so long as the employee is acting within the general scope of his authority and for the benefit of the employer."[36] Since the correctional officers' conduct appears motivated, at least in part, by a purpose to serve the master, this case is unlike other cases that have found tortious conduct not to be within the scope of employment.[37] For these reasons, the WVRJCFA may be held vicariously liable for the actions of the correctional officers.

In addition to the vicarious liability of the WVRJCFA, Mr. McDonald also alleges it was negligent in its training and supervision of the correctional officers. We recognize that the doctrine of qualified immunity bars a claim of mere negligence against a State agency like the WVRJCFA:

> In the absence of an insurance contract waiving the defense, the doctrine of qualified or official immunity bars a claim of mere negligence against a State agency not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29-12A-1 *et seq.*, and against an officer of that department acting within the scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer.[38]

As we concluded in *West Virginia Regional Jail Authority v. A.B.*, "the broad categories of training [and] supervision . . . easily fall within the category of 'discretionary' government functions."[39] As discretionary functions, it is incumbent upon Mr. McDonald to identify a clearly established law that the WVRJCFA violated in its training and/or supervision of the correctional officers. Mr. McDonald cites to a now-repealed statute—West Virginia Code § 31-20-9—as the "clearly established law" that the WVRJCFA violated as pertains

---

[36] *Travis v. Alcon Laboratories, Inc.*, 202 W. Va. 369, 381, 504 S.E.2d 419, 431 (1998).

[37] *See W. Va. Reg'l Jail v. A.B.*, 234 W. Va. at 509, 766 S.E.2d at 769 (finding that sexual assault of an inmate was not within scope of employment).

[38] Syl. Pt. 7, *W. Va. Reg'l Jail v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (quoting Syl. Pt. 6, *Clark v. Dunn,* 195 W.Va. 272, 465 S.E.2d 374 (1995)).

[39] *W. Va. Reg'l Jail v. A.B.*, 234 W. Va. at 514, 766 S.E.2d at 773.

to its training and supervision. He also alludes generally to the Code of State Rules, C.S.R. § 95-1-1, imposing standards for the operation and maintenance of jails. But like the plaintiff in *West Virginia Regional Jail Authority v. A.B.*, Mr. McDonald fails to identify any specific violation of these regulations, aside from generally asserting that because of the alleged excessive force he was deprived of a "safe environment" and that this was due to negligent training and/or supervision. These generalities are inadequate to overcome the WVRJCFA's entitlement to qualified immunity from a claim of mere negligence. So, that claim against the WVRJCA lacks legal and factual support, and summary judgment in its favor should have been granted.

### C. Administrator Crawford and Captain Aldridge

Petitioners also argue that the supervisory defendants, Administrator Crawford and Captain Aldridge, are entitled to qualified immunity as a matter of law. Regarding the claims against them for negligent supervision and training, Petitioners contend that Mr. McDonald's reliance on the now-repealed West Virginia Code § 31-20-9—that required the WVRJCFA to set standards for staffing and training, inmate safety, and medical services—does not rise to the level of "clearly established law" that the supervisory defendants violated. As indicated above, we agree that Mr. McDonald has cast his net in an excessively broad fashion. He "must make a 'particularized showing' that a 'reasonable official would understand that what he is doing violated that right' or that 'in the light of preexisting law the unlawfulness' of the action was 'apparent.'"[40] As noted above, West Virginia Code § 31-20-9 does not constitute a clearly established law for qualified immunity purposes because it does not prescribe any specific behavior by the supervisory defendants and does not clearly define any rights.

Although Mr. McDonald offered various policies and procedures of the WVRJCFA below, he has not identified any conduct on the part of the supervisory defendants that could be considered a violation of a clearly established law or right sufficient to overcome qualified immunity as described in *West Virginia Regional Jail v. A.B.* In the same way, Mr. McDonald has not provided a factual record that could present a triable issue of fact regarding alleged negligent training or supervision, fraudulent, malicious, or oppressive conduct by Administrator Crawford or Captain Aldridge. And in *Robinson v. Pack*,[41] this Court recognized that supervising officers cannot be held civilly liable for the wrongful conduct their subordinate officers:

---

[40] *Hutchison v. City of Huntington*, 198 W. Va. 139, 149 n.11, 479 S.E.2d 649, 659 n.11 (1996) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

[41] 223 W. Va. 828, 679 S.E.2d 660.

Under the holding of *Ashcroft v. Iqbal*, [556] U.S. [662], 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009), a supervising police officer may not be held liable for the wrongful actions of his or her subordinate officers in connection with an alleged civil rights violation because a supervising police officer is only liable for his or her own conduct and not that of his/her subordinates.[42]

For these reasons, Administrator Crawford and Captain Aldridge are entitled to summary judgment as a matter of law.

## IV. Conclusion

For the reasons set out above, the order of the Circuit Court of Cabell County is affirmed, in part, and reversed, in part, and this case is remanded for further proceedings consistent with this memorandum decision.

Affirmed, in part, reversed,
in part, and remanded.

**ISSUED:** March 31, 2023

**CONCURRED IN BY:**

Chief Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton
Justice C. Haley Bunn

---

[42] *Id*. at Syl. Pt. 5.